Whyte, J udge.
The question presented upon this record for the opinion of the courtis, whether the evidence adduced in support of the prosecution warranted the conviction of the plaintiff in error, of the crime of Bigamy.
In support of the conviction it is argued by the counsel for the State, that by the common law, which is founded on the scriptures, the opinion of the ancient iatin fathers of the church, the --of the general counsel of bishops, &c. &c. from which, together with the civil law, the common lawyers have borrowed almost all their notions of the legitimacy of marriage, no particular form of solemnizing the marriage ceremony was necessary, — that the primary and grand characteristic of the union of the parties being their mutual consent thereto, founded on their respective capacity to give it. This capacity existing, consent was evidenced, per verba de, presentí which constituted ipsurn ma.irimoniumper se: or per verba defuturo, followed by cohabitation.
On the other side, for the plaintiff in error, it was insisted, that marriage is a contract of the highest importance, involving in its consequences, not only the happiness of the parties to it in their individual and private capacities, hut in having a powerful hearing and effect upon society in general, as regarding its morals, good order, peace, prosperity and harmony — all objects of the highest interest — and, accordingly,it has attracted the notice, and occupied the attention of all enlightened governments. That this course has been pursued by this government, acting upon the above principle of individual and national *179 importance; and, at sundry limes, during its existence from its commencement, (above a century ago) down to the present time, has made legislative regulations respecting it, as the state of society and changes in government seemed to require, ft is, therefore, contended by them, to be extremely difficult to maintain, that the law of marriage, as at the common law before the colonial government of North Carolina had existence, should now be the rule here, on this important subject, non obstanti, the different legislative provisions on the very same subject matter.
It is certainly a correct proposition, not only in theory, but proved by constant practice that every independant, community, or government, has the right to regulate its own concerns; to make what laws it pleases; to abrogate and repeal existing laws theretofore made, and enact new ones respecting the same matters. The constitution of North Carolina in the preamble and first section, and her declaration of rights, sections 1 and 2, adopted December 17 and IS, I77G, declared this: and the constitution of Tennessee, in its preamble, and article 1, sec. 1 and 2, adopted 6th February 1798, did the same. Hence it is the power of these sovereign states, declared in, and pursuant to their constitutions and declarations of rights, acted upon in practice from the time of making them in their respective legislatures, and the laws so made, that is, to give the rule or rules, governing the present case, and not the power of the canon law, the common law of England, or the law of any other community, or country what ever. Upon these principles it will he examined, whether the connexion of the plaintiff in error, or his marriage with Sally Cole in the year 1797, was or was not such a connexion or marriage as, when taken into view with his subsequent marriage with Sally Williamson in the year 1827, constituted the offence of bigamy, and lawfully rendered him liable to a conviction for the same. The legality of the first marriage must therefore depend entirely upon the acts of assembly of the State of North Carolina, passed before the separation of the State of *180 Tennessee from the State of North Carolina, and the acts of assembly of the State of Tennessee, passed since that separation. These acts have been all cited and commented upon, by the counsel on both sides; and upon them, on the part of the State, it is argued that they are all affirmative statutes, except one clause or section in the act of 1776, and that is virtually repealed by the act of 1778, and, therefore, they do not repeal the common law, by which law the marriage with Sally Cole, is a valid marriage. ()n the other side it is argued that these acts of assembly are introductive of a new law respecting marriage, inconsistent with the common law, superseding it, and establishing, as a consequence, that the putative marriage of the plaintiff in error with Sally Cole is not a valid marriage. The construction of these acts of assembly, on legal principles, must be had on a view of them taken all together. Lord Mansfield, in the case of the King vs. Lansdale and others, (I Burrows Rep. 447,) lays it down, that “where there are different statutes in pari materia, tho’ made at different times, or even expired, and not referring to each other, they shall be taken and construed together as one system and as explanatory of each other;” and he instances the laws concerning church leases, those concerning bankrupts and those providing for the poor, asoné system, relative to the subject respectively. A short view of our acts of assembly respecting marriage will, therefore, be taken. The first act is 1715, ch. 1, we know nothing of it in certainty except its title which is: “an act concerning marriages.” It is noted in the oldest revisal of the North Carolina laws, within our reach, Davis’revisal of 1773, as obsolete, and only now noticed by us, as showing, that at a very early period after the organization of the colonial government, the subject attracted the attention of its legislature, and was, by them, considered of sufficient magnitude to require legislative interference by act of assembly. The next act is the 38th ch. of the same year (sec. 15,) requiring the registration of all marriages, and imposing it a duty on every married man, to remit to the register a certificate *181 of his marriage, and cause the same to he registered, under a penaitj. The next is the act of 1741, ch. 1, entitled, “an act concerning marriages” sec. 1, commences as follows: “for preventing clandestine and unlawful marriages, it is enacted” &c. “That every clergyman of the church of England, and for want of such, any lawful magistrate, shall join together, in the holy estate of matrimony, such persons who may lawfully enter into such á relation and have complied with the directions hereinafter mentioned.” Sec. 3 says — “no minister or justice of the peace, shall celebrate the rites of matrimony between any persons, or join them together as man and wife, without license first had and obtained for that purpose, according to the directions of this act, or thrice publication of the banns as prescribed by the book, of common prayer”— and in the following clauseitsays: “If any minister or justice of the peace shall, contrary to the true intent and meaning of this act, celebrate the rites oí matrimony” &c. “he, or they, shall forfeit and pay the sum of £50.” Sec. 6, directs the license to be issued by the clerk of the county where the feme resides, and then only under the rules prescribed, that is, he shall take bond with security in the penalty of £50, that there is no lawful cause to obstruct the marriage for which the license is desired; and in the case of minors, if not heretofore married, the consent of the parent or guardian be personally given before the said clerk, or signified under the hand and seal of the parent or guardian, attested by two witnesses; which being done, the clerk shall write the license or consent as aforesaid, to the first justice in commission of the peace, or such other person as the governor shall appoint. And a license so obtained is declared a lawful license, and no other. And by a subsequent clause, if the clerk issue a license, or make a certificate of license other than directed by the act, he shall forfeit and pay £50. The next act is 1766, ch. 9, its title is “an act to amend an act entitled an act, concerning marriages.” This act, in its leading features, is of the same import as the act of 1741; it expresses, recapitulates and re-enacts the great requi *182 sites necessary to the constitution of a legal or valid marriage, and enforces their observance under penalties. It makes some alteration as to the persons authorized to sol-emize the rites of matrimony, extending the provision. The 1 sec. recites, “that whereas, by the act of 1711, no minister or justice of the peace, shall celebrate the rites of matrimony between any persons without license or certificate of publication: and whereas, the presbyteriau or dissenting clergy, conceiving themselves not included in the restriction of ministers mentioned in that act, have joined persons together, in holy matrimony, without either publication or license” &c. The 2d sec. declares all marriages that have been solemnized by the dissenting or presbyterian clergy, legal and valid. In the 7th scc.it is made lawful for any Presbyterian minister to celebrate the rites of matrimony in their usual and accustomed manner, under the same regulations and restrictions, as any lawful magistrate might do the same. And sec. 8, requires the marriage so solemnized by any Presbyterian minister to be under a license from the Governor. The 3d sec. that no minister of any church of England or justice of the peace, shall, under the penalty of £50, solemnize any marriage or join any persons together as man and wife, without certificate of thrice publication of banns according to the directions of this act, or license first had under the hand and seal of the Governor, who is authorized to grant the same on certificate of the clerk of the county court of his having taken and filed in his office the usual bond, in the penalty of £50, that there is no lawful cause to obstruct the marriage for which the license is desired. The 6th sec. imposes ihe same duty upon the clerk before making the certificate to the Governor under the 3d sec. of this act, that it did by the 4th sec. of the act of 1741, before he issued the license and under the same penalty. The last clause of the 8th sec. says: “and that all marriages solemnized as aforesaid, without such license, shall he and are hereby declared illegal and void.” The next act 1778, is in substance the same as the preceding acts of 1741 and 1776, authorizing, *183 in the 2d sec. all regular ministers of the gospel of every denomination, having the care of souls, and all justices of the peace, to solemnize the rites of matrimony according to the rites and ceremonies of their respective churches, and agreeably to the rules in this act prescribed. By sec. 3, the power of granting license is given to the clerk of the county court in which the feme resides, he first taking bond in the name of the G overnor and his successors,' with sufficient security, in the sum of £590, that there is no lawful cause to obstruct the marriage. By sec. 4, every minister of the gospel, qualified as in the act directed, or other person appointed by the church a reader, is authorized and empowered to publish the banns of matrimony which shall be made three several Sundays, and shall give a certificate of such publication directed to any authorized minister or justice of the peace. And by sec. 5, if any minister or justice of the peace, shall knowingly join together in matrimony any two persons in any way or manner, other than by this act directed, he shall forfeit and pay for every such offence the sum of £50. And if any clerk shall knowingly grant marriage license in any way or manner, other than in this act directed, he shall forfeit and pay the sum of £100. The act of 1815, ch. 47, requires the minister of the gospel, or the justice of the peace, who solemnizes the riles cf matrimony, to endorse on the hack of the license, the time of the marriage, and to sign his name thereto, and return the license to the clerk of the county court, whose duty it shall he to file the license in the office, which license and certificate shall he considered as competent evidence of the said marriage.
The more important provisions of these acts of assembly, are almost entirely the same, exhibiting a settled purpose to fix and regulate the contract of marriage so as to rest orbe dependant on municipal law alone; establish-inga system intended to be complete in itself, evidenced by the attention paid to every particular, in form, as well as substance, which the importance of such a relation, both in a private and a public view', so deservedly merit' *184 ed. Hence, these acts of assembly, as was intended by them, operate and effect a change in the form and substance of the ceremony of the marriage contract, and its solemnization, from what it was at the common law. 1. In requiring publicity and permanency of its evidence, by the registration of the marriage, and filing the license and certificate of marriage, by the acts of 1715 and 1815. 2. In requiring a regular, certain authority, empowering the solemnization of the marriage; which is a license ora certificate of the publication of banns, by the acts of 1741, 1766 and 1778. 3. In requiring the actual solemnization of the marriage ceremony by a person properly qualified, who is a clergyman of the church of England, or a justice of the peace by the act of 1741, — a minister of the church of England, a Presbyterian or dissenting minister, or justice of the peace, by the act of 1776, — and a regular minister of the gospel having the care of souls, or a justice of the peace, by the act of 1778; — in requiring the consent of the parent or guardian, when the parties or either of them are under the age of twenty one, and not theretofore married, by the act of 1741, sec. 6, which is legally provided for in the act of 1778, requiring, the Jirst talcing bond, before the license is granted, in the name of the Governor and his successors, with sufficient security, in the sum of five hundred pounds, with condition that there is no lawful cause to obstruct the marriage for which the license is desired. These requirements, .changing wholly the manner of solemnizing the matrimonial union from what it was at the common law, deciar-fmg and enacting, that they shall be complied with in fu(ture, and that the celebration of marriage shall not be [otherwise than as directed in these acts, and enforcing the performance and due execution of them under forfeitures and penalties recoverable by law, besides the express declaration iff terms, “that all marriages, solemnized as aforesaid, without such license first had, shall be, and are hereby declared illegal and void” — We say, that these requirements,under these circumstances,constitute such a body of proof, as to render irresistible, in our opinions, *185 the correctness of the position, that a marriage, to be valid,must be according to these acts, and that the common law is wholly superseded on the same subject by them. To say otherwise, would be not only to prostrate the well directed labors of the legislature, on the subject, for the last hundred years, but on. our part, the expression of a gratuitous and improper assumption, that the legislature did not intend what they have so repeatedly and expressly declared.
The counsel for the plaintiff in error have cited many authorities on the construction oí statutes, which authorizes the construction this court has made on these acts of assembly, and support the conclusion they have arrived at as above stated, it would be quite unnecessary to notice many — a few only will be referred to. In Hobart 98, it is laid down: “the rule is, that affirmatives in statutes that introduce new laws, do imply a negative of all that is not in the purview,” case of Slade vs. Drake. The affirmatives in these acts of assembly that the marriage shall be according to the directions of the act,-are, 1715, sec. 15, first clause; 1741, sec. 1; 1756, sec 7and 8; 1778, sec. 1, and 1815, sec. 1; all these are express affirmatives, and 1766, sec. 1 and 3, are affirmatives by necessary implication. To the same point is Plow den 206, which says: “whence every statute, that limits a thing to be done in a particular form, altho’ it be spoken in the. affirmative, includes in itself a negative, (to wit,) that it shall not be done otherwise, (Stradling vs. Morgan.) But these acts have not permitted the introduction of the new law of marriage to rest upon affirmatives alone: they have used express negatives to the marriage being otherwise than according to the provisions of the act — they are 1741, sec. 3; 1766, sec. 1, and for proceeding.otherwise than according to the directions of the act, forfeitures are incurred and penalties inflicted by 1741, sec. 3 — 1766, sec. 5 and 7, and 1778, sec. 5. Lord Holt in Cartbew 252, says: “every contract made for or about any matter or thing which is prohibited and made unlawful by any statute, is a void contract, tho' the statute itself doth' not mention that it *186 snail be so, but only inflicts a penalty on the offender, because a penalty"implies a prohibition, tho’ there are no prohibitory words in the statute,” case of Bartlett vs. Vinor: — and Mansfield C. J. in 1 Taunt. 136 says: “and if any act is forbidden under a penalty, a contract to do it is now held voidi (Drury vs. Defontaine.)
It is not necessary upon the present occasion to give an opinion whether, in all cases where the question arises— whether there is a legal marriage or not, all the above requirements of the statutes must be proved to exist — we do not intend to go beyond the present case, and therefore, - now say, that in the prosecution for the offence of biga- ; my, to constitute a lawful or valid marriage, two requi- . sites are indispensable, and must be proved to have exist- , ed; 1st a proper authority, empowering the solemnization (of the marriage, which is a regular and lawful license; or a regular and lawful certificate of publication of banns. 2d. The solemnization of the marriage performed by a person duly qualified, that is, by a regular minister of the gospel having the care of souls, or a justice of the peace duly qualified.
Having seen the common law does not apply to the case, we proceed to examine whether the solemnization of the marriage of the plaintiff in error with Sally Cole in the year 1797,be avalid marriage, or otherwise, under our statutable system of municipal law, inclusive of the act of 1820, which has not yet been noticed — that act says: “if any person in this state, being married, do, at any time after the passing of that act, marry any person, the former husband or wife being alive., such offender shall be guilty of bigamy.” The plaintiff in error, in the year 1827, married Sally Williamson, under all the solemnities required by our acts of assembly, which marriage is admitted on the argument to be valid, unless rendered invalid by the prior marriage in 1797, with Sally Cole. The case turns on this last mentioned marriage. “In the year 1797, the plaintiff in error and Sally Cole appeared in the county of Davidson, before Isaac Walton, a justice of the peace of Sumner county, who.had no license authorizing a *187 solemnization, of the marriage ceremony, and they then and there in the county of Davidson, mutually agreed to take and did take each other for husband and wife, and the said Isaac Waltonpronounced them to be husband and wife.” This is not a valid marriage pursuant to the regulations of our acts of assembly — there is no authority empowering the solemnization of -the marriage, which must be either a lawful license, or a lawful certificate of the publication of banns. See 1741, ch. 1, sec. 3 — 1766, ch. 9, see. 3 — 1778, ch. 7, sec. 1, 2. — 2d. Isaac Walton was not a person duly qualified to solemnize the marriage in the county of Davidson; — that person must be a regular minister of the gospel who has the care of souls, or a justice of the peace duly qualified. See 1778, ch. 7, sec. 1 and 2, which in this case would be a justice of the peace for the county of Davidson. The person who affected to officiate on this occasion was a stranger to the official character required by the act of assembly for its performance. Isaac Walton, a justice of the peace for the county of Sumner, had no official power or authority, as a justice of the peace in Davidson county. He was then, on a level with every other uncommissioned private citizen. The office of justice of the peace, by our constitution, is local, confined within the bounds of the county, beyond which the person is divested of all official power and authority. This marriage of 1797, therefore, for the want of these two requisites, which are indispensable, is not a valid marriage within this act, so as to be considered a constituent part, in composing the offence of bigamy.
An inference has been attempted to be drawn from the 3d sec. of the act of 1820, in these words: “and in the absence of such certified copy, the testimony of any competent by-stander, who witnessed the performance of the marriage ceremony, shall be sufficient proof of such marriage.” The preceding part of the section is in these words: “Be it enacted that a certified copy of the marriage license by the clerk who issued the same, accompanied by the certificate of solemnization of the minister of the gospel, or justice of the peace, also copied and cerli- *188 tied, shall be sufficient proof of either the first or second marriage in any prosecution for bigamy, under this act.” It is argued, that in the absence of the testimonials, here mentioned, the act intended this parol evidence of a common law marriage should be sufficient: that is, that testimony of the consent of the parties, without showing that the intervention of the statutory requirements had ever existed in the case, would be sufficient. If this argument is well founded, it dispenses at once with the whole of our municipal law system on marriage — an inference that cannot be admitted, an effect only to he allowed upon the plainest, clearest, most explicit and positive enactment. But there is no difficulty in the passage, as to the understanding of its meaning. The parol testimony of any competent by-slander is in aid of justice, to supply the loss of what once existed, or the place of what cannot now be found; the written evidence or paper being mislaid, or, perhaps, destroyed by accident, by mischance or by time, maybe supplied by parol evidenee of its quondam existence aiid agency in the marriage ceremony. This is the true meaning of the passage, and the latter part of the clause, (to wit) — “shall be sufiicient proof of such marriage” explains it — what marriage? the marriage mentioned in the prior part of the section, that enters into the composition of the crime of bigamy, the proof of which is desired to be made by the testimony of the bystander. Now this must have been a valid marriage by license, for no other would answer the purpose on the prosecution for bigamy, and we cannot presume the legislature intended any other, as it would be a vain act. Besides, the first part of the section recognizes not only a marriage by license but also the once actual existence of the licence by saying, that a certified copy of it by the clerk, accompanied by the certificate of solemnization of the minister of the gospel, also copied and certified, shall be sufficient proof of the first marriage &c. It is a valid marriage, therefore, according to the municipal law of Tennessee, that is to be proved by the by-stander, and not a common law marriage. It is not intended here to con *189 vey tbe iJea that this by-slander shall prove that he saw the marriage license in the actual possession of the justice of the peace, or that he read it, having endorsed thereon the time of said marriage, with the justice’s name signed thereto, &c. and that the license and certificate were genuine and authentic papers; but he must give such testimony respecting these particulars, together with the performance of the ceremony, as will enable the jury, in the case of bigamy, to be satisfied that the marriage ceremony was actually performed under the authorities of a regular and genuine license, by a person duly qualified to solemnize it.
The statute 26th George the 2d, for the prevention of ! clandestine marriages, has regulations and provisions in it, nearly the same as our provincial act of 1766. The statute of George requires a license or publication of; banns, and it declares a marriage without them to be void. Our act of 1766, does the same. In prosecutions for bigamy in England, if the marriage were celebrated there, it may be proved by the production of the register of the marriage, or an examined copy of it, with proof of the identity of the parties &c. or the marriage maybe proved by some person, who was present at it; but then, it should seem, (says.the book) evidence must be given of banns, regularly published or of a license: and if the marriage were by license, that the parties were of age, or, if under age, that the consent' of the parent or guardian was had &c. &c. In fact, a valid marriage must be proved, per Raley, justice, in Smith vs. Janson, 1 Phillimore 287, and Archbold’scriminal pleadings358-9. These books are cited for the purpose of showing the construction of, and the practice under a statute having provisions similar to our statutes on the same subject, and as , being reputable opinions, corroborating the construction we have given, the act of 1820, that the testimony of the by-stander is not intended by the act to be the tes-timonjr of a marriage at common law, but the testimony of a marriage under our statute law.
Catron, J udge, concurred in opinion wi th J udge Whyte,
*190 Peck, Judge.
The act of 1741, ch. 1, provides that mjnjsf.ers 0f ¿pg c}lurch 0f England, or, for the want of such, justices of Fthe peace within the government are authorized to solemnize the rites of matrimony. But justices shall not marry in a parish where a clergyman resides, nor shall either the clergyman or justice marry without a license, to be issued by the Governor, or, the publication of banns, under the penalty of £50.
The act of 1766, ch. 9, in a preamble thereto, recites, as an evil, that the Presbyterian or dissenting clergy, not feeling themselves included in the restrictive clauses of the act of 1741, had married persons' without either license or publication of banns — whereby the just and legal fees to the Governor had been eluded, and the validity of marriages endangered — for remedy, it is provided, “that marriages theretofore made, by any of the dissenting clergy, should be valid, legal and effectual. The 2 sec. of the act, puts a positive injunction on Episcopal clergy and justices, and imposes a forfeiture of £50, if they shall celebrate the rites of matrimony without certificate of publication of banns, or a license. Sec. 7, places Presbyterian clergy on a footing with justices, (to .wit,) that they may celebrate the rites of matrimony, but must have a certificate of publication of banns, or a license from under the hand and seal of the Governor— then follows the 8th sec. in these words: “ Provided always, ■that all such marriages so solemnized by any presbyterian minister as aforesaid, shall be under a license, first had and obtained from the Governor or commander in Chief for the time being, or by license in such manner as directed by this act; and that all marriages solemnized as aforesaid, without such license first had, shall be and are hereby declared illegal and void.” The 9th sec. then follows: “And be it further enacted, That any presbyterian minister, solemnizing the rites of matrimony as aforesaid, without such license first had, shall, for every such offence forfeit and pay the sum of fifty pounds.” The 10th sec. is in the following words: “Provided always, That the minister of the church of England, having the care of any *191 ■parish, shall have the benefit of the fee for all marriages, in the said parish, if he., do not refuse to do the service thereof, although any other person performed the marriage ceremony.” Such was the law priorRo the revolution. I would here remark, that the granting the license, belonged to the Governor. — The fees for so doing formed one of his perquisites. For marrying, no matter whom, the legal fee went to the Episcopal clergymen who were the favorites with the government among religious orders.
The dissenting ministers claimed an independent right in their congregations to celebrate the marital rites. With a view to secure the fees to the Governor, the fee to the Episcopal clergy, as is provided by sec. 10, the act was passed — and to restrain the presbyterian clergy the 8th sec. was inserted. Thus the law stood for 12 years after the declaration of Independence, which instrument was aimed at the prerogatives of the governor and established clergy, (as well as the other matter, of higher moment, complained of in it.) The constitution of North Carolina was formed; and received its signature on the 18th December 1776. By the constitution, the executive, as he existed under the crown, wholly ceased. The 34th sec. °f that instrument levelled the Episcopal clergy to the rank of the clergy of all other denominations. We are left to conjecture the state of things that must have existed after this great revolution in the civil government of North Carolina.
There were two years within which period no person was provided by law to grant a license. No doubt the Episcopal clergy would publish the banns as before the revolution. But it is clear the presbyterian and other clergy, when placed upon a level with the Episcopalian clergy, by the constitution, felt themselves relieved from all restraint imposed by previous laws. That they did celebrate the rites of matrimony, in their congregations, as they had done before the act of 1766, is evident from the language used in the act of 1778. And, it is equally clear to my mind that this act of ’78 does and must stand alone as statute law on the subject of marriage. When *192 that act is examined it covers all the ground occupied by . . ,. . m the previous acts, and is suited to every condition, lo show that there had been irregularities, if not abuses, in celebrating marriages, it is only necessary to recur to the preamble: “Whereas it is absolutely necessary that rules should be observed, concerning celebrating the rites of matrimony.” This implies that it was considered there was no rule. The act then proceeds lo give a general and equal power to the clergy of every denomination of Christians, and to all justices of the peace in the state, to act according to the rites and ceremonies of their churches, and agreeably to the rules prescribed in the act. The remedy provided by this act was suited to our improved condition under the new form of government. The other acts were found not suited to our condition; to all useful purposes they were swept down by the revolution in government.
The 3d sec. authorizes the clerks of the several counties to issue a license lo any person applying for the same, • taking bond &c. Such license to be directed to any minister or justice of the peace. The next sec. (4) provides that every minister of the gospel, or any other person, appointed by the church as a reader, should haye power to publish the banns, and that the people called Quakers should be at liberty to retain their former rules and privileges: sec. 5, imposes penalties on persons celebrating the rites of matrimony any otherwise than by the act provided — also, imposes penalties on clerks for improperly issuing licenses. There is no repealing clause, 'nor is there any clause making void any marriage solem-ínized, otherwise, than as in the act provided.
The construction of this act must, therefore, determine the question; and,to be enabled to construe it, it will first be necessary to consider if it, (the act) was designed to, and does, in fact, repeal the common law. No question that has been before this court is of more importance than this. The peace and happiness of families; — nay the transmission of whole estates, depends upon it. The fate of the defendant, as respe'ets the question of guilt or in *193 nocence, is a secondary consideration. Society has much dependant on the result, and therefore, it is of the greatest consequence to examine with patience and care.
The act of North Carolina 1778, ch. 5, fixing what parts of the statute and common law shall be in force and use in North Carolina, was passed in the same year, and stands in juxta-position with the act we are about to give construction to. Marriage is a civil contract — all our laws, common and statutory treat it so. It is only as to the manner of bearing witness to it, that has been the subject of solicitude with legislators and judges. Under the act of 1778, nothing more was intended than that a person proper for the occasion should be present at the consummation of the contract. All ministers of the gospel of every denomination, or any justice of the peace in the State,had the power to become the witness of the ceremony of marriage. To all purposes except two, cohabitation alone, is necessary — the one is, where the question oí marriage arises on an indictment for bigamy — the other, in a suit for criminal conversation. These exceptions are made in tenderness to the party accused. In other cases touching'the proof of marriage, a sensible and obvious rule, of evidence, has been let in, (to wit) — that where persons have held themselves out as filling any particular station, they shall not be permitted to dispute that they had been regularly called to fill that station: and tho’ this rule is departed from in the particular case before us; yet it does not, for that reason, follow, that every minutia of the marriage must be proved, to make it a legal marriage. The act says a license may be issued, but it cannot be pretended by any lawyer that a marriage publicly made, and a community called to witness it, was not a legal marriage, and binding upon the parties. No court, for the want of a license would pronounce the marriage clandestine — no rule of law would permit such a construction. To admit the conclusion, would be to permit a man and woman to play off, in the face of a whole community, a most shameful farce — it would be to tolerate acts of open fornication or adultery, nor would this be half the evil, *194 men might, (tho’ few it is hoped would be so bad,) contrive the semblance oi marriage, leaving out some one requisite, as that of not procuring a license, and then— according as contingencies might arise, nullify all by leaving their wives; abandoning them and their own offspring, leaving them at the mercy of, or a charge to others. It is going very far to permit any man to show that he had contracted a clandestine marriage; and thereby, make his turpitude, that, which is so great a reproach to him, the means of his own security.
At common law, it is the declared assent of the will to the act of marriage, which makes it legal — a mental reservation of one at the time shall avail nothing; but such declaring their assent shall be bound. Nothing can be clearer to my mind than that a marriage, as to the parties, shall be binding, altho’ without a license; but from motives of policy it was deemed proper to caution persons authorized to solemnize the rites, not to do it without a license, and the very imposing the penalty for marrying without license, on the person authorized to do so, proves that the marriage is legal; for if it were illegal, it would be no marriage, and the forfeiture would not be incurred. It is, therefore, not the meaning of the act, that the marriage shall be void. If you can go back to the ceremony, and show something wanting, as for instance, a licence: — then, for the same reason, you may show a licence was void because no bond had been taken, or one taken which was informal or void for other cause, for the bond is equally a requisite of the law.
The obvious meaning and intention of the act of 1788, is, that the marriage of the party shall be binding — it cannot have a construction that a marriage, which proves interesting and agreeable to all parties, shall be binding, if made without the requisite of a license; and not binding if it prove not agreeable, or to the interest of one of the parties. Such a latidude would put it in the power of men to dispose of the rights and feelings of women at pleasure.
I come now, to consider of another question, (to wit,) *195 that of the justice being out of his county at the time he appeared and witnessed, or, if you please, solemnized these rites. It is said the justice had no power beyond his county; and, being a justice for Sumner county, and acting in this particular in Davidson; — the act was void. Our constitution art. 5, sec. 12, provides that “there shall be justices of the peace appointed for each county, not exceeding two for each captain’s company, who shall hold their offices during good behaviur.” That a justice of the peace, as such, must be appointed for the county will not be denied; but that all his acts must be confined to the county, to make them effectual, does not follow. Many of his acts, which by law he has to do, purely as a justice of the peace, can be done at anyplace and be effectual. The presiding justice, on certain occasions, certifies that a particular person is clerk of the court of pleas, for his county. Place, in making this, is not of the essence of the thing doing, and can be as well done at'one place as another — so he may make out a judgment, (having heard the cause in the proper county) any where: he may take a bond for an appeal, or make certificate of his record, on an appeal allowed. All these acts, altho’ directly connected with his duty as a justice, he may do out of his county and yet the act cannot be questioned. Who will pretend that he must have his foot in his county when he signs an execution on a judgmentpreviously rendered, or when he delivers it? it might just as well be argued that he shall not, if beyond his county, think as a justice of the peace, touching the cause he may have under advisement, as to say he shall not do these things. It is refining beyond the letter of the constitution, certainly, to contend for it. But all this may be conceded, and still the justice have power to witness the marriage ceremony; for a distinction must be taken, between these acts which are purely judicial and such as are of a character purely testimonial. If this distinction is. observed, then we shall obviate difficulties which seem to puzzle, only because they are novel. My position is, that the justice may perpetuate an act in pais, where memory alonéis ¡.he record, *196 if he is named as the person to do it, as well in one place . , . . ,. . _ . , . ... ... as in another: and in this I am borne out by the act lt-self: “all ministers of the gospel and all justices of the peace in this state, are hereby authorized,” &c. To the same point, and to the like extent, is the language of the license given in the act: “which license shall be directed to any authorized minister or justice of the peace.” Territorial limits are not even implied by the act. It cannot, for a moment be pretended that it applies to the minister and not to the justice, as the. duty is put upon an equal footing. It is mere description of person, with respect to which place has nothing to do, provided the justice act within the state, and the language of the act of assembly covers the case. Either the minister or the justice when acting as the witness of a marriage, acts clerically, not judicially. The justice, as to the solemnity, is designated by description, he is, in fact, a clerk or clergyman for so much. If sued for the penalty and the breach laid, was that of marrying persons beyond his county, his plea would be that the same act which created the power, was broad enough to protect him. Matrimony being commendable, society calling for it as she does, her laws will make all reasonable intendment in support of its legality. Courts of justice will construe statutes not con-dieting with the common law, to stand with it. The sense of mankind will aid in construing a statute which reaches all orders of society. Such usage and continued practice of society, touching what is lawful, is an evidence of what the common law is. Mankind have always viewed a marriage, when celebrated, as a pad, or agreement, binding on the parties — the form pursued should not be critically examined to defeat the marriage, but would be taken liberally, to support it. The tender and most endearing ties of our nature, demand it should be so. It the common law is not repealed by the act, then there is no question the marriage is good to every intent. Vows were publicly made — witnesses were called, and acts, in after-life had proved, until after the birth of children, that both were sincere. All this evidence must stand togelh *197 er — it all speaks the assent of the will and consnmmation of the nuptials. The rights of the innocent offspring speak in such a case; and their rights,as well as the rights of ofiended society, must he heard.
It is shown in the record that the first wife is, and has long keen living in adultery with another man. 1 his, for several reasons can weigh nothing in favor of the defendant. The act of 1809, concerning divorces, provided for the injured husband ample redress, provided he had been in no default himself. If he were conscious of having been in none — why did he not apply to the courts of justice, and obtain a divorce? Judgment Reversed.