RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNIVERSAL LIFE CHURCH MONASTERY STOREHOUSE, a Washington non-profit corporation; ERIN PATTERSON and GABRIEL BISER, individuals,

*Plaintiffs-Appellees/Cross-Appellants*,

*Plaintiffs-Appellants* (21-5100),

*v.*

WAYNE NABORS, in his official capacity as County Clerk of Putnam County, Tennessee (21-5059/5100); LISA DUKE CROWELL, in her official capacity as County Clerk of Rutherford County, Tennessee (21-5057/5100); WILLIAM F. KNOWLES, in his official capacity as County Clerk of Hamilton County, Tennessee (21-5058/5100); ELAINE ANDERSON, in her official capacity as County Clerk of Williamson County, Tennessee (21-5055/5100); HERBERT H. SLATERY III, in his official capacity as Attorney General of the State of Tennessee, JENNINGS H. JONES, in his official capacity as District Attorney General of Rutherford County, Tennessee, NEAL PINKSTON, in his official capacity as District Attorney General of Hamilton County, Tennessee, BRYANT C. DUNAWAY, in his official capacity as District Attorney General of Putnam County, Tennessee, and KIM R. HELPER, in her official capacity as District Attorney General of Williamson County, Tennessee (21-5048/5100),

*Defendants-Appellants/Cross-Appellees*,

BILL LEE, in his official capacity as Governor of the State of Tennessee,

*Defendant-Appellee* (21-5100).

Nos. 21-5048
/5055 /5057 /5058
/5059 /5100

———————————

Appeal from the United States District Court for the Middle District of Tennessee at Cookeville.
No. 2:19-cv-00049—Waverly D. Crenshaw Jr., District Judge.

Argued: December 9, 2021

Decided and Filed: May 27, 2022

Before: SUTTON, Chief Judge; STRANCH and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Herbert H. Slatery III, et al.  Lisa M. Carson, BUERGER, MOSELEY & CARSON, PLC, Franklin, Tennessee, for Elaine Anderson.  Jeffrey G. Jones, WIMBERLY LAWSON WRIGHT DAVES & JONES, PLLC, Cookeville, Tennessee, for Wayne Nabors. Ambika K. Doran, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, for Universal Life Church Monastery Storehouse, et al.  **ON BRIEF:**  Matthew D. Cloutier, Leslie Ann Bridges, Steven A. Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Herbert H. Slatery III, et al. and Bill Lee.  Lisa M. Carson, Lee Ann Thompson, BUERGER, MOSELEY & CARSON, PLC, Franklin, Tennessee, for Elaine Anderson.  Jeffrey G. Jones, WIMBERLY LAWSON WRIGHT DAVES & JONES, PLLC, Cookeville, Tennessee, for Wayne Nabors.  Ambika K. Doran, Bruce E.H. Johnson, Robert E. Miller, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, Rocklan W. King III, ADAMS AND REESE LLP, Nashville, Tennessee, Lucian T. Pera, ADAMS AND REESE LLP, Memphis, Tennessee, for Universal Life Church Monastery Storehouse, et al.  Nicholas C. Christiansen, Daniel W. Ames, HUDSON, REED & CHRISTIANSEN, PLLC, Murfreesboro, Tennessee, for Lisa Crowell. Rheubin M. Taylor, Mary Neill Southerland, Sharon McMullan Milling, HAMILTON COUNTY ATTORNEY'S OFFICE, Chattanooga, Tennessee, for William F. Knowles.

---

## OPINION

---

JOHN K. BUSH, Circuit Judge.  Universal Life Church Monastery ("ULC") permits anyone who feels so called to become ordained as a minister—over the Internet, free of charge, and in a matter of minutes.  Should the newly minted minister wish to solemnize a marriage in Tennessee, however, she will encounter a problem.  Tennessee law permits only those "regular" ministers—ministers whose ordination occurred "by a considered, deliberate, and responsible act"—"to solemnize the rite of matrimony."  Tenn. Code Ann. ("TCA") § 36-3-301(a)(1)–(2). And since 2019, the law has explicitly clarified that "[p]ersons receiving online ordinations may not solemnize the rite."  *Id.* § 36-3-301(a)(2).

Asserting that those restrictions violate the federal and Tennessee constitutions, ULC and various of its members sued several Tennessee officials to pursue an injunction and declaratory judgment.  Yet the officials contend that they have sovereign immunity from suit and that, in any

event, plaintiffs lack standing to sue.  The district court rejected those contentions by and large, entering a preliminary injunction against several defendants.  We are now asked to take up the same questions and reverse the district court.  And, indeed, we hold that many of plaintiffs' claims must be dismissed for lack of standing.  But we also hold that as to the remaining claims presenting a live case or controversy, the district court properly denied sovereign immunity.  We will thus remand a narrow portion of plaintiffs' suit for further proceedings below.

## I.

Tennessee's tradition of regulating who may solemnize marriages is evidently nearing its two-hundred-fiftieth anniversary.  A 1778 act[1] authorized "all regular ministers of the gospel of every denomination, having the care of souls, and all justices of the peace, to solemnize the rites of matrimony."  First Br. [21-5048] at 6 n.1 (quoting *Bashaw v. State*, 9 Tenn. 177, 183 (1829)). That language remains substantially the same today, though it is now somewhat more ecumenical in scope.  As § 36-3-301 explains, "[a]ll regular ministers, preachers, pastors, priests, rabbis and other spiritual leaders of every religious belief, more than eighteen (18) years of age, having the care of souls," may solemnize marriages in Tennessee.  TCA § 36-3-301(a)(1).

ULC's objection to that language is of more recent vintage.  A non-profit corporation now headquartered in Seattle, ULC espouses two key tenets: to do "that which is right" and that everyone has a right "to practice their beliefs."  SAC ¶¶4, 23–24, R. 80 Whether ULC has any other views is unclear.  But at least one thing it strongly advocates is that anyone "who feel[s] so called can become [a] minister[ ] through the Church."  SAC ¶26, R. 80. ULC will thus ordain as a minister—for free and over the Internet—anyone who completes a simple, online form.  *Id.*

For its part, the Tennessee Attorney General's office appears to have first opined upon ULC's practices in September 1997.  In its Opinion No. 97-41, it considered whether ULC ministers could solemnize marriages under an earlier version of § 36-3-301.  *See* AG Op. No. 15-14, R. 123-7 (describing AG Op. No. 97-41); *see also Scott v. Ashland Healthcare Ctr., Inc.*,

---

[1]Tennessee, of course, was admitted to the Union in 1796.  This language comes from a North Carolina statute "passed before the separation of the State of Tennessee from the State of North Carolina."  *Bashaw v. State*, 9 Tenn. 177, 179–80 (1829).

49 S.W.3d 281, 287 (Tenn. 2001) (explaining that Tennessee Attorney General opinions, though nonbinding, are entitled to "considerable deference" (citing *State v. Black*, 897 S.W.2d 680, 683 (Tenn. 1995)). It determined that they could not, reasoning that the statute's text at the time implicitly required ordination to be "a considered, deliberate, and responsible act." AG Op. No. 15-14, R. 123-7. Because ULC's ordination process, in the Attorney General's view, is none of those things, the opinion concluded that "ministers of the Universal Life Church are not permitted to solemnize marriages." *Id.*

A month later, the Attorney General released further opinions addressing related issues: First, assuming that a ULC minister *does* solemnize a marriage, is that putative marriage necessarily invalid? *See* AG Op. No. 97-138, R. 123-6. And second, do the county clerks who issue and record marriage licenses have the power or duty to enforce § 36-3-301? *See* AG Op. No. 97-139, R. 116-1.

Opinion No. 97-138 dealt with the first question—whether couples in Tennessee are "legally married when the person who conducted the ceremony was an ordained minister in the Universal Life Church[.]" AG Op. No. 97-138 at *1, R. 123-6. The opinion presented that issue as a complicated one. Ordinarily, Tennessee has a "very strong" "presumption in favor of marriage." *Id.* So Tennessee courts sometimes *treat* couples as married even if their original ceremony had some technical defect, like having been performed before the proper license was obtained. *See id.* at *2 (citing *Johnson v. Johnson*, 41 Tenn. 626, 631 (1860)). But they sometimes may also declare a marriage "void" when "the officer who attempted to solemnize the . . . ceremony 'was without authority to do so.'" *Id.* at *3 (citing *Moore v. Moore*, 1986 WL 8426, at *1, *3 (Tenn. Ct. App. Aug. 4, 1986)). The opinion thus concluded that a Tennessee court indeed *could* find a ULC-minister-solemnized marriage "void," given ULC ministers' apparent failure to "meet the statutory qualifications" for solemnizing a marriage. *Id.* at *5.

Opinion No. 97-139 then answered the second question—whether "county clerks have discretion to examine the qualifications of officiants to determine that the person is a minister of the gospel under Tenn. Code. Ann. § 36-3-301[.]" AG Op. No. 97-139, R. 116-1. The Attorney General's opinion answered *that* question in the negative. "[T]he General Assembly,"

it explained, "has not given county clerks the authority to examine the qualifications of a person seeking to solemnize a marriage." *Id.* at 1. Rather, "[t]he duty of the county clerk to record marriage licenses upon certification by the officiant remains a ministerial duty." *Id.*; *see also id.* (describing the "duty of the county clerk to register marriage licenses upon certification by the officiant [as] a purely ministerial duty"). Clerks thus have no authority or discretion to reject a marriage license simply because the officiant listed upon it was ordained by ULC. *See id.* at 3 (explaining that the legislature "has not created any discretion for the clerk to examine the qualifications of persons solemnizing the marriage").

Soon after, the Tennessee General Assembly inserted that "considered, deliberate, and responsible act" construction from Opinion No. 97-41 into the statute itself with a 1998 amendment to § 36-3-301. *See* AG Op. No. 15-14, R. 123-7. The new language thus reads, in relevant part, "[i]n order to solemnize the rite of matrimony, any such minister, preacher, pastor, priest, rabbi or other spiritual leader must be ordained or otherwise designated in conformity with the customs of a church, temple or other religious group or organization; and such customs must provide for such ordination or designation *by a considered, deliberate, and responsible act*." TCA § 36-3-301(a)(2) (emphasis added). ULC argues that this legislative cut-and-paste from the Attorney General opinion represents the targeting of disfavored religious practices. *See, e.g.*, Second Br. [21-5100] at 6–7.

Nonetheless, in February 2015 the Attorney General issued Opinion No. 15-14, which considered whether and how the 1998 amendment to § 36-3-301 affected the office's previous view that ULC ministers cannot solemnize marriages in Tennessee. *See* AG Op. No. 15-14, R. 123-7. The Attorney General concluded that the 1998 changes had only strengthened its position, given that the legislature had directly codified into the statute the "considered, deliberate, and responsible act" language from Opinion No. 97-41. *Id.* at 1. As Opinion No. 15-14 explained, those now-"explicit[ ] additional requirements" showed *a fortiori* that ULC's "ordination process does not meet the statutory requirements." *Id.* at 1–2. The Attorney General thus reiterated that ULC ministers "are not qualified under Tenn. Code. Ann. § 36-3-301 to solemnize a marriage." *Id.* at 2.

In 2019, the General Assembly then enacted two measures targeting ULC even more directly than did its 1998 revision.  First was an amendment to § 36-3-301 clarifying that "[p]ersons receiving online ordinations"—as do ULC ministers—"may not solemnize the rite of matrimony."  TCA § 36-3-301(a)(2); *see also* SAC ¶28, R. 80.  Second was an act reinforcing that so-called "ordination ban" with an amendment to Tennessee's false-statements statute.  *See* SAC ¶31, R. 80; Second Br. [21-5100] at 9.  It works like this:  Ministers completing a marriage license must attest that they have "solemnize[d] the rite of matrimony between the" now-married couple.  TCA § 36-3-304.  But making a false statement on the license—for instance, by claiming to have solemnized a marriage despite knowingly lacking the requisite authority—may be construed as making a false entry in a government record.  *See* TCA § 39-16-504(a)(1); Second Br. [21-5100] at 9.  The legislature increased the penalty for such an entry from a misdemeanor up to a "Class E" felony, punishable by one to six years in prison, and a $3,000 fine.  *See* TCA § 40-35-111(b)(5); Second Br. [21-5100] at 9.  And the increase was made effective as of July 1, 2019—the same effective date of the "ordination ban."  Second Br. [21-5100] at 9.

Plaintiffs brought a pre-enforcement challenge in response, naming certain Tennessee officials as defendants, including Governor Bill Lee, Attorney General Herbert Slatery, and several counties' district attorneys general and county clerks, all in their official capacities.  Plaintiffs filed their initial complaint in June 2019, and later an operative, second amended complaint ("SAC") in July.  *See* Amended Compl., R. 55; SAC, R. 80.  Suing under 42 U.S.C. § 1983, they allege that Tennessee's restrictions represent an establishment of religion, an impermissible burden on religious free exercise, and an abridgement of ULC and its ministers' freedom of speech, all in violation of the First Amendment.  *See, e.g.*, SAC ¶¶64, 74, 80, R. 80.[2]

---

[2]Because this appeal concerns only the standing and sovereign-immunity issues, we express no view on the merits of plaintiffs' underlying claims.

They also asserted pendent state-law claims alleging violations of the Tennessee constitution.[3] *Id.* ¶¶81–90.

While these theories have remained steady throughout the lawsuit, the personnel asserting them has not. Plaintiffs at first comprised ULC itself; ULC ministers Erin Patterson, Gabriel Biser, and James Welch; and a couple, Gale Plumm and Timeaka Farris, who had been married by a ULC minister. *Id.* ¶¶4–8, R. 80. Together, they alleged that Tennessee had unconstitutionally "draw[n] a line between favored and disfavored religious groups" with its antagonism of ULC. *Id.* ¶33. More specifically, Patterson, Biser, and Welch all alleged that they wished to solemnize future marriages in their home counties—Rutherford, Hamilton, and Putnam, respectively—but that they had been deterred from doing so by the 2019 amendments. *See id.* ¶¶38–39, 43–44, 50–51. Plumm and Farris, for their part, alleged that they had sought a marriage license from Putnam County Clerk Wayne Nabors, but that he had denied the license because Welch planned to solemnize their marriage. *Id.* ¶¶47–48. So Plumm and Farris were forced to travel to a neighboring county to get a license. *Id.* ¶49. Plaintiffs thus collectively requested injunctive and declaratory relief against potential enforcement of § 36-3-301.[4] They also moved for a temporary restraining order ("TRO") and requested an emergency hearing. Mot., R. 11. Defendants moved to dismiss, arguing that the ordination requirements have no enforcement mechanism, that plaintiffs lack standing, and that, in any event, defendants enjoy sovereign immunity from suit. *See, e.g.*, Mot. to Dismiss at 1–2, R. 115.

Eventually the district court held the requested hearing and issued an order containing three pertinent rulings. Order, R. 53. First, it ordered that "the STATUS QUO SHALL BE MAINTAINED" until the district court had "issue[d] a ruling after the trial."

---

[3]As with federal-law claims against them, states have sovereign immunity in federal court to state-law claims, at least absent an immunity exception or an express waiver permitting federal jurisdiction. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103–12 (1984); *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (holding that a state's consent to suit in state court does not waive a state's immunity to suit in federal court). Thus, our discussion of potential exceptions to sovereign immunity applies to plaintiffs' federal-law and state-law claims alike.

[4]Though the complaint also included a money-damages claim, plaintiffs later categorically disavowed any intent to seek money damages. *See, e.g.*, Second Br. [21-5055] at 25 n.11. They are now pursuing only declaratory and injunctive relief.

*Id.* at 1.  (Though we understand this order as a negative injunction blocking enforcement, one county clerk has apparently interpreted it as an affirmative injunction to issue marriage licenses to couples whose proceedings were ULC-minister-solemnized.  *See* Knowles Trial Br. at 5 n.3, R. 139.)  Second, the district court held that the TRO request would be "CONSOLIDATED with a trial on the merits," which the district court later suggested would take place on an accelerated schedule.  *Id.* at 1, R. 53.  And third, the court ordered that "[b]ecause the parties' focus should be on the trial on the merits, NO DISPOSITIVE MOTIONS shall be filed without leave of the Court."  *Id.*

This order proved problematic for defendants.  Given their belief that they are entitled to sovereign immunity, that plaintiffs lack standing to sue, and that the ordination requirements have no enforcement mechanism, defendants wished to assert those arguments in pretrial motions.  *See, e.g.*, Mot. for Leave to File Mot. to Dismiss, R. 99.  The district court eventually granted defendants leave to file such motions, but it then refused to adjudicate them.  Order, R. 109.  Instead, it apparently reasoned that the earliest it could rule on sovereign immunity was at the trial itself.  Order, R. 140.  Defendants, however, filed an interlocutory appeal seeking a stay of the case until the district court ruled on the immunity motions.  Not. of Appeal, R. 141.  As the appeal was pending, the district court voluntarily granted a stay and agreed to rule on the immunity motions before the case proceeded.  Order, R. 194.  So we remanded the case for the immunity ruling. *Universal Life Church Monastery Storehouse v. Nabors*, No. 19-6217 (6th Cir. Aug. 3, 2020) (order).

The district court then issued the decision now under review.  Its corresponding opinion also contains three pertinent rulings.  The district court first dismissed the claims of plaintiffs Plumm and Farris as "moot," though later remarking that it was probably more accurate to say that they "lacked standing."  *Universal Life Church Monastery Storehouse v. Nabors*, 508 F. Supp. 3d 221, 230–31 (M.D. Tenn. 2020); *id.* at 231 n.5.  That was because by the time that Plumm and Farris had entered the case, Jackson County had already issued them a marriage license.  *Id.*  As to the couple's lingering doubts about the validity of their marriage, the district court noted that the 2019 amendments included an explicit grandfather clause exempting it from

potential invalidation. *Id.* ("If a marriage has been entered into by license issued pursuant to this chapter at which any minister officiated before July 1, 2019, the marriage must not be invalid because the requirements of the preceding subdivision (a)(2) have not been met." (quoting TCA § 36-3-301)). Plaintiffs have not cross-appealed the district court's dismissal of Plumm and Farris's claims. *See* Second Br. [21-5055] at 11 n.3.

Second, the district court ruled that the remaining plaintiffs—ULC, Erin Patterson, and Gabriel Biser—*did* have standing to sue. *Universal Life Church*, 508 F. Supp. 3d at 231–36. Not among that list, of course, was by-then former plaintiff James Welch. *See id.* at 227 n.3. Over a year after the complaint was filed, he submitted an affidavit explaining that he did "not wish to continue as a Plaintiff in this matter." Welch Affidavit, R. 218-1. He thus requested an order dismissing him from the suit, which the district court granted. *Id.*; *see also* Order, R. 235. But as to the remaining plaintiffs—ULC, Patterson, and Biser—the district court held that each had sufficiently alleged injury, causation, and redressability.

Last, the district court held that of all the defendants, only Governor Lee was immune from suit. *Universal Life Church*, 508 F. Supp. 3d at 236–41. Analyzing the immunity issues under *Ex parte Young*, the district court recognized that plaintiffs may seek injunctive relief against state officials only if those officials have some "connection" to the contested law's enforcement. *Id.* at 238 (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)). Far from making those requisite allegations against Governor Lee, however, plaintiffs had "said nothing about the Governor's involvement in this case and his connection to the Act's enforcement." *Id.* (quoting *Kelly v. Lee*, No. 1:18-cv-00170, 220 WL 2120249, at *3 (E.D. Tenn. May 4, 2020)). But as to the other defendants—Attorney General Slatery, the four district attorneys general, and the four county clerks—the district court found a sufficient enforcement connection. *Id.* at 238–41. Each was said to be involved, in one way or another, with enforcing or administering the challenged regime. *Id.* Thus, held the district court, sovereign immunity did not afford defendants a shield from injunctive or declaratory relief. *Id.*

Defendants below (minus the Governor) timely filed the present interlocutory appeal to contest most of that ruling. They all contend that they are entitled to sovereign immunity, as

they either have not threatened enforcement of, or lack an enforcement connection to, the contested laws. *See, e.g.*, *id.* at 11. And they also argue, relatedly but even more fundamentally, that plaintiffs lack standing to sue. *See, e.g.*, First Br. [21-5048]. Plaintiffs contest these points and have also conditionally cross-appealed Governor Lee's dismissal should we hold that no other officials are proper defendants. *See* Not. of Cross-Appeal, R. 252, Fourth Br. [21-5100] at 5. We confront these respective contentions below after examining jurisdiction and our standards of review.

## II.

We have statutory jurisdiction over the district court's denial of immunity by virtue of 28 U.S.C. § 1291. Section 1291 authorizes appellate-court jurisdiction over the "final decisions" of the district courts. Under the collateral-order doctrine, we treat denials of sovereign immunity as "final," given that they are "effectively unreviewable" upon appeal from a final judgment. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)); *see also Mingus v. Butler*, 591 F.3d 474, 481 (6th Cir. 2010).

## III.

Three standards of review are relevant to this appeal. First, we review questions of standing and mootness *de novo*. *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019). Because this appeal comes to us on a motion to dismiss, we take as true the well-pleaded allegations in the complaint and ask whether plaintiffs plausibly alleged their standing to sue. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021). Second, we likewise consider *de novo* the denial of sovereign immunity. *Mingus*, 591 F.3d at 481. And last, our review of a decision dismissing a complaint is, again, *de novo*. *See Giasson Aerospace Sci., Inc. v. RCO Eng'r Inc.*, 872 F.3d 336, 338 (6th Cir. 2017). We thus "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

**IV.**

*A. Standing*

On interlocutory appeal, we review both the disputed collateral order and any other issue that we must examine "to ensure meaningful review" of the collateral order. *Swint*, 514 U.S. at 51. Because we believe that standing is one such issue here, we will consider it first before turning to sovereign immunity. *See, e.g.*, *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 531–32 (2021) (plurality) (quoting *Swint*, 514 U.S. at 51); *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019) (explaining that subject-matter-jurisdictional inquiries may be raised "at any point in the litigation").

As the Supreme Court has reminded us, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Rather, plaintiffs "must demonstrate standing for each claim [they] seek[ ] to press." *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006). And they must do so "*separately* for each form of relief sought." *Id.* (emphasis added) (citation omitted); *see also id.* ("The remedy must . . . be limited to the inadequacy that produced the injury in fact."). Thus, plaintiffs needed to allege how the requested relief against *each* of the defendants could redress plaintiffs' alleged injuries-in-fact. As discussed below, however, our review of the complaint reveals that they have not met that burden. That said, we must only assure ourselves that one plaintiff has standing for the suit to move forward on a claim against a defendant. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

1.  Governor Lee

Plaintiffs' allegations against Governor Lee are sparse. The SAC simply asserts that Governor Lee "is an elected official, invested with the supreme executive power of the state," and that he must take "care that the laws be faithfully executed." SAC ¶57, R. 80 (quoting *Doe v. Haslam*, No. 3:16-cv-02862, 2017 WL 5187117, at \*6 (M.D. Tenn. Nov. 9, 2017); then quoting Tenn. Const., art. III, § 10). Yet such a general allegation about the Governor's "take care" power does not suffice to invoke federal jurisdiction. We need specific, plausible allegations about what the Governor has done, is doing, or might do to injure plaintiffs.

*See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44. Without them, plaintiffs have shown no basis on which they can seek an injunction—an *in personam* decree coercing the Governor to act or refrain from acting—or a declaratory judgment, the "real value" of which is to influence the future "behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). To the extent plaintiffs have been injured, in other words, they have not explained how the *Governor* caused the injury. They have also failed to show what a federal court could order the Governor to do or refrain from doing to give them relief—a redressability defect. No Article III case or controversy exists, therefore, against Governor Lee.

### 2. Attorney General Slatery

Plaintiffs' standing to sue Attorney General Slatery is a more difficult question. What plaintiffs must show to have standing to seek an anti-enforcement injunction (or related declaratory relief) is that Slatery can and may take some enforcement action against them. *See Doe v. DeWine*, 910 F.3d 842, 848–49 (6th Cir. 2018) (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015)). But how he might do so is far from clear. One might think that he, as the state's chief law-enforcement officer, could bring a false-statements prosecution against ULC ministers. Yet it turns out that the Tennessee Attorney General does not have the power to initiate criminal prosecutions. *See* First Br. [21-5100] at 18; TCA § 8-6-109. Tennessee's Attorney General is limited to handling appeals, reporting court decisions, offering advisory opinions, suing to recover public funds, and defending the constitutionality of state statutes. TCA § 8-6-109. It's the *district* attorneys general, by contrast, that actually initiate criminal enforcement proceedings. *See* TCA § 8-7-103(1). So there is no imminent prosecution that a federal court could coerce *the Attorney General* to refrain from undertaking.

Plaintiffs resist that conclusion by emphasizing that the Attorney General is, under TCA § 8-6-109, a proper *defendant* to a suit that attacks the constitutionality of a Tennessee statute. But that fact alone does not suffice for plaintiffs to secure an anti-enforcement injunction. The relevant question is not whether the Attorney General may defend the constitutionality of the statute, but whether he can prosecute plaintiffs under it. And because he cannot, plaintiffs have

not shown standing to seek equitable relief against the Attorney General decreeing that he refrain from enforcement.

Other avenues for standing are similarly unpromising. Plaintiffs could show standing to sue the Attorney General—even if he could not initiate the prosecutions himself—if he could still bring about those prosecutions by commanding the district attorneys general to prosecute. Here at least, however, neither law nor fact supports that theory of standing. The Tennessee Constitution and TCA § 8-6-109 never say that the Attorney General has the power to direct or command district attorneys general to undertake prosecutions. *See generally* Tenn. Const. art. IV; TCA § 8-6-109. Indeed, the Tennessee Constitution says that when a district attorney "fails or refuses to attend and prosecute according to law," it is actually the job of the local district court "to appoint an attorney *pro tempore*" to initiate the prosecution. Tenn. Const. art. VI, § 5. The Attorney General never steps in. And plaintiffs have not alleged that the Attorney General, despite those constitutional and statutory disabilities, has somehow issued a direct command to district attorneys general to prosecute ULC ministers.

What plaintiffs come closer to alleging is that the Attorney General is *indirectly* enticing district attorneys general to prosecute by issuing his interpretive opinions "denigrating" ULC ordination. Second Br. [21-5100] at 37. Plaintiffs thus request a decree forcing Slatery to retract the opinions and to refrain from further comment on ULC. *Id.* But this request once again fails the redressability requirement. To invoke federal jurisdiction, plaintiffs have the burden of showing some "viable remedy" we can dispense that would at least partially relieve their injury. *Alston v. Advanced Brands & Imp. Co.*, 494 F.3d 562, 565 (6th Cir. 2007). So what would happen if we could somehow "erase" the interpretive opinions? ULC-minister solemnization would *still* be clearly illegal under TCA § 36-3-301, as the statute now explicitly disallows solemnization by ministers who received an online ordination. *See* TCA § 36-3-301(a)(2). And the statute would also still include the "considered, deliberate, and responsible act" language. *Id.* It is not as if there exists some statutory ambiguity and the interpretive opinions are breaking a tie in favor of prosecution. Even absent those opinions, given that their content has now been

codified into the statute itself, the district attorneys general would still have the same duty to "prosecute according to law." Tenn. Const. art. IV, § 5.

The last and perhaps least persuasive theory of standing to sue Slatery is that the interpretive opinions cajole or entice the *clerks* to deny marriage licenses to couples whose marriages were solemnized by ULC ministers. Second Br. [21-5055] at 4–6. But this theory has all the previous problems and then some. As for traceability, the Attorney General's office has explicitly told the clerks that they have *no* authority, much less a duty, to inspect officiants' credentials before issuing the licenses. *See* AG Op. No. 97-139, R. 116-1. To the contrary, Opinion No. 97-139 calls the issuance of licenses "a ministerial duty" and one the clerks must perform irrespective of "the qualifications of [the] person[ ] solemnizing the marriage." *Id.* As a result, no plaintiff has standing to sue Attorney General Slatery.

### 3.   Williamson County District Attorney General Kim R. Helper

Likewise, no plaintiff may seek injunctive or declaratory relief against Williamson County District Attorney Kim R. Helper. Helper has not denied licenses or issued interpretive opinions; rather, the relevant theory of injury is that Helper could initiate a false-statements prosecution against a ULC minister who solemnized a marriage and completed the associated license in Williamson County. So the corresponding relief would have been either an injunction restraining that proceeding or a declaratory judgment explaining that such a proceeding would be unconstitutional. Plaintiffs claim three possible avenues to establish their standing for such relief: individual standing through the remaining individual plaintiffs (Patterson and Biser), individual standing on ULC's behalf on the theory that such a prosecution would injure ULC itself, and ULC's associational standing to sue on behalf of its injured members. *See, e.g.*, Second Br. [21-5055] at 30. But none of those theories applies to Helper.

Take first the claims about Patterson and Biser. Establishing that either had individual standing to sue Helper would have required allegations that Patterson or Biser plans to solemnize future marriages in Williamson County. But the SAC contains no such allegations. Biser has alleged only that he "resides in *Hamilton* County and intends to solemnize weddings there in the

future."  SAC ¶44, R. 80 (emphasis added).  He said nothing about his plans in *Williamson* County. Patterson, too, has alleged only that she "performed multiple weddings in *Rutherford* County and plans to perform more."  *Id.* ¶39, R. 80 (emphasis added).  She never alleged plans to do so in Williamson County.  True, she *did* allege that she had agreed to perform a marriage in Williamson County in October 2019 but withdrew after learning about the amendments to § 36-3-301.  *Id.* ¶38.  But without allegations of Patterson's plans in Williamson County, we have no basis to conclude that she is "likely to suffer future" enforcement there.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

ULC's theories of individual and associational standing present the same problem.  ULC argues that it has individual standing because ULC itself would suffer an injury-in-fact from a prosecution of one of its ministers or that, even without an injury to itself, it can sue on behalf of its ministers through associational standing to prevent the ministers' prosecution.  *See, e.g.*, Second Br. [21-5055] at 30.  Each is essentially the same theory.  The SAC never alleges that ULC *itself* may undertake some action subjecting it to criminal liability as an association.  So both the individual- and associational-standing theories hinge on a minister becoming subject to criminal prosecution.  Only *then* could ULC itself be injured by a prosecution that injures a member.  To obtain a decree restraining Helper from initiating such a proceeding, ULC thus needed to allege that some named member (whether a party to the suit or not) plans to solemnize a future marriage in Williamson County.  *See Waskul v. Washtenaw Cnty. Comty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018).  But ULC has identified no named member that plans to do so.  We have no basis, therefore, to conclude that ULC has standing to protect itself or one of its members from prosecution in Williamson County.

### 4.  Hamilton County District Attorney General Neal Pinkston

Gabriel Biser's bid for relief against Hamilton County District Attorney General Neal Pinkston, however, is a different story.  The SAC *does* allege that Biser "resides in Hamilton County and intends to solemnize weddings there in the future."  SAC ¶44, R. 80.  So Biser is subject to a potential false-statements prosecution in Hamilton County if he were to claim on a marriage license that he "solemnized" a proceeding, despite knowing that he lacks such

authority.  *See* TCA §§ 36-3-301(a)(2), 39-16-504(a)(1).  Pinkston would cause that injury by filing the charges, and the district court could redress it by enjoining Pinkston from doing so.  Because causation and redressability are satisfied, we turn to the remaining and more complex inquiry—whether Biser plausibly alleged that he would suffer the injury-in-fact of an imminent prosecution.  In our view, he has.

First, Biser has plausibly alleged that he is "able and ready" to violate the contested statutes.  *Carney v. Adams*, 141 S. Ct. 493, 500 (2020).  He has previously "solemnized four marriages as a ULC Monastery minister in Tennessee."  SAC ¶41, R. 80.  He was also asked to perform another ceremony relatively recently, "but canceled after learning of" the anti-online-ordination amendment.  *Id.* ¶43.  And he alleges that he intends to solemnize future marriages in Hamilton County.  *Id.* ¶44.  We take these allegations as true in this posture, and none is implausible.  *See Courtright*, 839 F.3d at 518.

Second, surrounding factual circumstances show that a fear of prosecution is plausible.  The Tennessee legislature's 2019 amendments explicitly ban online ordination.  *See* TCA § 36-3-301(a)(2).  No explanation for that ban has been provided other than to target ULC ministers.  Likewise, the legislature heightened the false-statements penalty and gave it the same effective date as the ordination ban.  Second Br. [21-5100] at 9.  The contemporaneity of those enactments reinforces the inference that the legislature intends to target plaintiffs.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993).  And Pinkston, as a district attorney general, has both a "constitutional and statutory obligation to prosecute offenses committed in [Hamilton] County."  *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999); *see also* TCA § 8-7-103(1) ("Each district attorney general . . . [s]hall prosecute in the courts of the district all violations of the state criminal statutes[.]").  Thus, "by signing a [license]," Biser "would be subject to the real and immediate (not merely conjectural or hypothetical) harm of criminal penalty."  *Zielasko v. Ohio*, 873 F.2d 957, 959 (6th Cir. 1989); *see also id.* ("Because [the plaintiff] would have filed a declaration of candidacy *but for* the fear of criminal penalty for election falsification, a justiciable controversy exists in this case.").

Last, defendants have never provided clear assurances that they will *not* prosecute ULC ministers. As plaintiffs note, "the State Defendants [have] refused to disavow intent to prosecute ministers criminally" or "to stipulate to the law's unconstitutionality" and contest only sovereign immunity. *See* Second Br. [21-5100] at 23, 25. Indeed, both before this suit was filed and in the district court below, defendants took no meaningful steps—like submitting an affidavit forswearing prosecution—to mitigate plaintiffs' fears. Nor could counsel for the state defendants provide such assurances when given a final opportunity at oral argument.

Clearer, at least, is defendants' claim that no future prosecution is imminent because there has never been a ULC minister prosecuted in the past for violating § 36-3-301. *See* First Br. [21-5048] at 5, 26 n.12. True, the Supreme Court has sometimes held that no case or controversy exists when an enforcement challenge attacks a law that has fallen into desuetude. *See, e.g.*, *Poe v. Ullman*, 367 U.S. 497, 502 (1961). But we do not find this argument persuasive here for several reasons. Almost as soon as the law went into effect, the district court entered its "status quo" order, which appears to preliminarily enjoin prosecution of ULC ministers. Order, R. 53. So the fact that no one has been prosecuted under the amendment is unsurprising. The state defendants seem to argue instead that ULC solemnization was *already* illegal before 2019—with the amendment just making the proscription clearer—given the "considered, deliberate, and responsible act" requirement. First Br. [21-5048] at 33–34. That may be true, but that preexisting language was also fairly vague. By making the proscription so much clearer in 2019, the legislature may have emboldened prosecutors in a way that they were not before the amendment.

It's also not clear that before 2019 prosecutors had even realized they could collaterally enforce § 36-3-301 (which lacks its own enforcement mechanism) with the false-statements statute. The earlier Attorney General opinions just say that ULC solemnization is not allowed—not that it could subject ministers to false-statements prosecutions. *See, e.g.*, AG Op. No. 15-14, R. 123-7. That specter seems to have arisen only around mid-2019, when the legislature simultaneously enhanced the false-statements penalty as it codified the ordination ban. Last, there is no evidence before us about how frequent or obvious were ULC ministers' violations

*before* 2019. So unlike the "commonly and notoriously" violated contraception statute in *Poe* that posed no obstacle to "ubiquitous, open, public sales" of birth control, 367 U.S. at 502, no evidence on this record reflects that prosecutors have deliberately turned a blind eye to ULC ministers' solemnization.

The only remaining question is whether ULC itself, in addition to Biser, may likewise sue Pinkston for an injunction. To establish associational standing, ULC must show "that: (1) its 'members would otherwise have standing to sue in their own right'; (2) the 'interests' that the suit 'seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 537 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)).

As to plaintiffs' claim against Pinkston, ULC's associational standing under these elements is straightforward. Because Biser has individual standing, at least one named member of ULC has "standing to sue [Pinkston] in [his] own right." *Id.* ULC's asserted interest—preventing the prosecution of one of its members for acting upon one of ULC's central beliefs—is obviously "germane" to ULC's purpose. *Id.* And Biser *is* participating in the suit, so ULC's claim against Pinkston does not implicate whether relief would also be proper in the individual member's absence. We thus hold that both Biser and ULC have standing to seek injunctive and declaratory relief against Pinkston.

5. Rutherford County District Attorney General Jennings H. Jones

For the same reasons, Patterson has standing to sue Rutherford County District Attorney General Jennings H. Jones. Patterson has alleged that she resides in Rutherford County, "has performed multiple weddings in Rutherford County[,] and plans to perform more." SAC ¶¶6, 39, R. 80. She also apparently began to "make changes to her approximately eight-acre property" in Rutherford County to "allow her to host weddings," but she later "halt[ed]" those plans after the 2019 amendment. *Id.* ¶39. She thus has individual standing to sue to prevent (or to have declared unconstitutional) a potential false-statements prosecution. And, because

preventing that possibility is "germane" to ULC's purpose, it has associational standing to sue Jones as well. *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 537.

### 6.  Putnam County District Attorney General Bryant C. Dunaway

We turn now to whether ULC has associational standing to seek declaratory and injunctive relief against Putnam County District Attorney General Bryant C. Dunaway.  We hold that it does. In the SAC, former plaintiff James Welch alleged that he had solemnized weddings before, felt deterred from doing so by the 2019 amendment, "resides in Putnam County[,] and intends to solemnize weddings there in the future."  SAC ¶¶46, 50–51, R. 80.  Welch thus had individual standing to sue Dunaway for the same reasons that Biser and Patterson have individual standing to sue Pinkston and Jones, respectively.  And ULC had associational standing, via Welch, to sue Dunaway as well.

The more difficult question is whether there *continues* to be a case or controversy between ULC and Dunaway.  Over a year after plaintiffs filed the SAC, defendant clerk Wayne Nabors procured an affidavit from Welch conveying Welch's intent to withdraw from the lawsuit.  Welch Affidavit, R. 218-1.  And the district court granted Welch's request.  Order, R. 235.  So Welch's *individual* claims for relief are now moot.

But Welch's withdrawal from the case did not moot ULC's claim to relief against Dunaway.  ULC had already identified another ULC minister intending to perform future marriages in Putnam County: Michael Veal. *See* Veal. Dec., R. 122.  Our precedent has not foreclosed organizations from showing associational standing with one named member in the complaint and then maintaining a live controversy after the original member's claim is extinguished by identifying some other named member who would have a live claim in his own right. *Cf. Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 559 & n.1 (6th Cir. 2021).  There is also no discernible prejudice to defendants here in allowing ULC to switch members.  So ULC's claim against Dunaway lives on.

7.  Rutherford County Clerk Lisa Duke Crowell, Williamson County Clerk Elaine Anderson, and Hamilton County Clerk William Knowles

Though plaintiffs have established standing to sue three of the four district attorneys general, they have *not* established standing to sue three of the four county clerks—Lisa Duke Crowell, Elaine Anderson, and William Knowles.  As these defendants point out, the SAC presents no specific allegations against them.  *See* First Br. [21-5055] at 6; First Br. [21-5057] at 7–8; First Br. [21-5058] at 4.  It alleges just that Crowell is the clerk in Rutherford County, Anderson the clerk in Williamson County, and Knowles the clerk in Hamilton County. SAC ¶¶10–12, R. 80.  The SAC *does* later imply that this trio has either dissuaded or will dissuade couples from seeking the service of ULC ministers or that they may refuse to issue licenses should a ULC minister solemnize the proceedings.  *Id.* ¶54.  But these theories have a major problem.  Unlike the district attorneys general—imbued with both the discretion and the duty to prosecute violations—the clerks have *no* discretion and *no* authority under state law to deny a couple a marriage license just because a ULC minister solemnized the proceeding.  *See, e.g.*, AG Op. No. 97-139, R. 116-1.

All the clerks here agree on that point.  *See* First Br. [21-5055] at 5–6; First Br. [21-5057] at 37; First Br. [21-5058] at 27; First Br. [21-5059] at 11.  They all describe their license-issuance duties as ministerial and they all agree that they lack the authority to deny a license just because a ULC minister solemnized the proceeding.  *Id.*  They likewise represent that they have never denied and never would deny a marriage license on that basis.  *Id.*  And their position tracks the Attorney General's.  Once again, his Opinion No. 97-139 explains that "county clerk[s have] no authority to require proof that the officiant is a 'regular minister of the gospel' or other authorized person who meets the criteria of T.C.A. § 36-3-301."  AG Op. No. 97-139, R. 116-1.  That is so, in his view, because Tennessee's legislature "has not created any discretion for the clerk[s] to examine the qualifications of persons solemnizing the marriage." *Id.* So we have difficulty seeing wherein lies the case or controversy.

Plaintiffs resist this conclusion by contending that the county clerks enjoy statutory authority to deny the licenses for two reasons, both found in TCA § 36-3-103(c)(1).  First, that

statute explains that clerks are "authorized to record and certify any license used to solemnize a marriage that is *properly signed by the officiant* when such license is returned to the issuing county clerk."   TCA § 36-3-103(c)(1) (emphasis added).   Plaintiffs say that a ULC minister cannot "properly sign" a license under § 36-3-301, and thus that a county clerk is bound to deny a license to a couple employing a ULC minister.  First Br. [21-5055] at 21–22.  But the "properly signed" requirement concerns whether the couple filled out the form correctly, not whether the purported officiant enjoyed the substantive authority under Tennessee law to solemnize the proceeding.   Thus, the clerk must "verify [the applicants'] identity, age, and social security numbers" and ensure that all the blanks in the form are completed.  *Ochalek v. Richmond*, No. M2007-01628-COA-R3-CV, 2008 WL 2600692, at *4 (Tenn. Ct. App. June 30, 2008).  But she is not bound to further investigate the purported officiant's solemnization credentials.

Second, plaintiffs note that § 36-3-103(c)(1) likewise "prohibit[s]" a county clerk "from issuing a license for a marriage that is prohibited in this state."  First Br. [21-5055] at 18.  The plaintiffs then reason that marriages are "prohibited" if the officiant performing them—such as a ULC minister—lacked the requisite authority.  *Id.*  But that is also wrong.  ULC-minister-solemnized marriages are not *prohibited* under the statute; they simply may later be challenged for *invalidity* in a subsequent proceeding.  *See* AG Op. No. 97-138, R. 123-6.  And based on the results of that proceeding, such marriages may or may not be upheld.  *Id.*  Prohibited marriages, by contrast, are those that Tennessee considers categorically illegal and void *ab initio* even *if* the newlyweds satisfied all the procedural requirements.  *See Guzman v. Alvares*, 205 S.W.3d 375, 381 (Tenn. 2006).  They include incestual, forced, and child marriages; a purported marriage performed when a party was "drunk, insane or an imbecile"; bigamy; and polygamy.  *See* TCA §§ 36-3-101, 36-3-02, 36-3-105, 36-3-108, 36-3-109, 36-3-113.  None of those has anything to do with the qualifications of the officiant.  So there is no statutory basis here to conclude that the county clerks may deem a marriage "prohibited" just because a ULC minister solemnized it.

Given the clerks' lack of *de jure* authorization to reject ULC-solemnized marriages, we would have needed allegations that the clerks still *act* as though they have such authority and deny licenses on that basis.  And we would have taken those allegations as true, no matter the

content of Tennessee law, as we are on a motion to dismiss.  *See Courtright*, 839 F.3d at 518.
But those allegations are just what the SAC does not contain, at least as to Crowell, Anderson,
and Knowles.  As a result, it never articulates how these three clerks, simply by issuing the exact
licenses that couples are asking for, inflict injury-in-fact on the remaining plaintiffs.

Perhaps realizing this issue, plaintiffs have expanded their theory of injury on appeal.
They now say that the clerks inflict injury even *if* they issue every license ever requested.  First
Br. [21-5055] at 12.  That's because when the underlying marriage was solemnized by a ULC
minister, the validity of the marriage is subject to doubt.  *Id.*  Thus, it is claimed, the clerks still
"injure" plaintiffs even *if* they issue the licenses because the licenses they issue are of only
dubious validity.  *Id.*

Creative as it is, however, this theory fails both the causation and redressability
requirements.  The marriage licenses and associated marriages are potentially invalid because of
the underlying *statute* banning ULC ordination—not because of anything the clerks do.  The
clerks have no authority to modify or repeal § 36-3-301.  That statute would still exist—still
impugning the marriages' validity—no matter what relief the district court awarded against the
clerks.  At least from the three compliant clerks, in other words, there is no behavior
modification the court could coerce with an injunction that would redress the "potentially-
invalid-license" theory of injury.  And there being no jurisdiction for an injunction, there is none
for a declaratory judgment either.  *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895,
903 (6th Cir. 2014).  Plaintiffs thus have never shown their standing to sue Crowell, Anderson,
or Knowles.

### 8.   Putnam County Clerk Wayne Nabors

Unlike with the compliant clerks, the SAC contains more specific allegations against
Putnam County Clerk Wayne Nabors.  Former plaintiffs Plumm and Farris alleged that they
selected former plaintiff Welch to solemnize their marriage.  SAC ¶47, R. 80.  In May 2019,
Plumm "left work early so the couple could obtain a marriage license from the Putnam County
Clerk before the office closed."  *Id.* ¶48.  They met with an "elderly woman" who, upon learning

"that a ULC Monastery minister [would] marry the couple . . . refused to issue them a marriage license." *Id.* She also warned that ULC ministers cannot "perform marriage ceremonies and that their marriage would be invalid," even showing them a copy of an Attorney General opinion. *Id.* Nabors himself then intervened, confirming "that a marriage license would not be issued if a ULC Monastery Minister [were] to solemnize the marriage." *Id.* Plumm and Farris thus had to travel to neighboring Jackson County to "obtain[ ] a marriage license." *Id.* ¶49.

Nabors strenuously contests that view of the facts. *See* Third Br. [21-5059] at 13–16. He admits that his staff member gave Plumm and Farris a copy of the Attorney General opinion, but he denies that he or his staff ever "refused to issue the license." *Id.* at 13. Rather, he claims that Plumm and Farris stormed out "before the marriage license could be issued." *Id.* Yet this case arises on a motion to dismiss, so we take the SAC's allegations as true. As a result, we must assume that Nabors and his staff indeed denied the license to Plumm and Farris due to the involvement of a ULC minister.

With Plumm and Farris gone from the suit, the more pressing question is whether anyone has standing to sue over such alleged behavior. ULC claims associational standing, which hinges on whether it has identified any individual member that could sue Nabors for declaratory or injunctive relief. *See Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 537. And we believe it has. ULC's associational standing derives from the combination of Welch and Veal. Again, the SAC alleges that "Welch resides in Putnam County and intends to solemnize weddings there in the future." SAC ¶ 51, R. 80. And Welch's affidavit withdrawing from the case never disclaims that intention—only his desire to remain a plaintiff. *See* Welch Affidavit, R. 218-1. So taking the SAC's well-pleaded allegations as true, Nabors may again withhold a marriage license simply because Welch, a ULC minister, solemnized the proceeding. *See SEC v. Wash. Cnty. Util. Dist.*, 676 F.2d 218, 227 (6th Cir. 1982) (noting that "[p]roof of past violations of the . . . laws serves as a basis for an inference that future violations may occur"). Likewise, Nabors may also decline to issue licenses simply because of Veal's involvement. So even if ULC needed to identify another named member after Welch's withdrawal, Veal fits the bill.

Last, both Welch and Veal would have had claims for declaratory and injunctive relief against Nabors in their own right.  As to injury-in-fact, the argument is that Nabors's future denial of licenses to couples—predicated on his alleged discrimination against ULC—would violate the ministers' *own* First Amendment rights.  This is not a third-party-standing case, in other words, where the ministers seek to redress the *couples'* interest in obtaining a license.  *Cf. Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 547.  The ministers instead would have had standing to assert their own rights against what they allege is religious discrimination directed at them and their work-product (the licenses) motivated by Nabors's alleged view that the ministers belong to an unqualified or illegitimate church.  *See id.*  None of that hinges on the religious sympathies of the couples.  And we note that causation and redressability are satisfied as well. A decree coercing Nabors to grant a license even if the marriage were solemnized by a ULC minister would redress the injury caused by the denial of the license.

Likewise, combatting discrimination against ULC's ministers is surely "germane" to its purpose as an organization.  *Id.* at 537.  And associational-standing doctrine requires neither Welch's nor Veal's individual participation for ULC to secure an injunction on their and other members' behalf.  *See id.* at 540–41.  Thus ULC, via Welch and Veal, has associational standing to seek declaratory and injunctive relief against Nabors.

*B. Sovereign Immunity*

We now turn to the purported sovereign immunity of the remaining defendants against which there exists a live case or controversy.

1.  District Attorneys General Dunaway, Pinkston, and Jones

The remaining district attorneys general argue that they cannot be sued because of sovereign immunity.  *See, e.g.*, First Br. [21-5048] at 13.  Sovereign immunity is, of course, an immunity of the sovereign; in this case, Tennessee.  But sovereign immunity can also apply to suits brought against state officers in their official capacities on the theory that because the state necessarily must act through its officers, such officer suits are really suits against the state. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101.  For over a hundred years, the retort to that

argument has been the *Ex parte Young* framework.   It allows plaintiffs to sue officers, irrespective of immunity, to enjoin their future actions on behalf of the state if those actions would violate the federal constitution.  *Ex parte Young*, 209 U.S. at 167.

As the theory goes, despite the officer's actions being taken pursuant to state authority, they are *treated* as if they were the officer's purely personal actions—thus undeserving of immunity—on the assumption that the state cannot authorize an unconstitutional act.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 272 (1997).   An officer's enforcement of an unconstitutional law, therefore, leaves him "stripped of his official . . . character" and stripped of corresponding immunity from suit.   *Ex parte Young*, 209 U.S. at 160.   This is the basic mechanism by which plaintiffs seek to circumvent defendants' assertion of sovereign immunity.

And, indeed, plaintiffs may validly employ the *Young* framework here because the district attorneys general have the requisite enforcement connection to the challenged laws.  *See Doe*, 910 F.3d at 848 (citing *Russell*, 784 F.3d at 1048).   They have the direct authority (and even duty) to enforce Tennessee's criminal prohibition against false statements made on marriage licenses.  Tenn. Const. art. VI, § 5; TCA § 8-7-103(1).   Plaintiffs allege that they want to violate that very law by making the representations that it and § 36-3-301 forbid.   And thus they fear that they would be subject to prosecution.   This showing readily satisfies *Young*. As our circuit has read that precedent, defendants do not even need "direct criminal enforcement authority" for plaintiffs to make use of the immunity exception.  *Doe*, 910 F.3d at 848.   It is instead sufficient to show that there is "a realistic possibility the official will take legal or administrative actions against the plaintiff's interests," like promulgating regulations or even administering a database.   *Id.* (citing *Russell*, 784 F.3d at 1048).   Because plaintiffs have surpassed that threshold, defendants, at least at the motion-to-dismiss stage, may not invoke sovereign immunity from injunctive or declaratory relief.

### 2.  County Clerk Nabors

Nabors also contends that he is entitled to sovereign immunity from suit given that Tennessee is supposedly the real party in interest to the claims against him as well.  *See* First Br.

[21-5059] at 27–35. He says that's so because he lacks an enforcement connection to the challenged laws, and thus that *Ex parte Young* does not apply. *Id.*

We disagree. Nabors has no sovereign immunity from suit, but our reasons for that conclusion differ from our reasons as to the district attorneys general. *Young* permits federal courts to treat real or threatened actions taken *pursuant to* state law as *ultra vires* on the "fiction" that states cannot authorize unconstitutional acts. *Ex parte Young*, 209 U.S. at 159–60. That is why *Young* was relevant to the claim against the district attorneys general—they execute a state statute on behalf of the state, and so would be treated as "the state" for immunity purposes but for the *Young* exception. Nabors, by contrast, has never even established that his alleged previous denial (and potential future denial) of marriage licenses is authorized by state law.[5] To the contrary, he *concedes* the very opposite—that he has no discretion to inspect the qualifications of officiants before issuing marriage licenses. First Br. [21-5059] at 11, 31. He instead argues that as a matter of historical fact, he has never actually denied the licenses. *See* Third Br. [21-5059] at 13–15. But as we have already explained, we cannot settle a factual dispute on a motion to dismiss, where we instead must take the complaint's well-pleaded allegations as true. *See Courtright*, 839 F.3d at 518. We thus assume that he has denied licenses in the past and draw the concomitant inference that he may do so yet again in the future. *Id.*

Because the sovereign concededly does not authorize that behavior, Nabors may not invoke sovereign immunity as a defense to this suit. In other words, the claim against Nabors is not akin to an antisuit injunction under *Young*, in which a state officer is blocked from acting *pursuant to* state authority. It is instead more analogous to a mandamus action compelling a recalcitrant officer to comply with his non-discretionary duties. And recalcitrant officers enjoy no sovereign immunity from orders commanding them to perform their non-discretionary duties or commanding them to cease performance of purely *ultra vires* acts. *See Larson v. Domestic &*

---

[5]Because Nabors works for a county, it might also at first appear that he cannot invoke the immunity of a *state*; counties, unlike states, have no sovereign immunity. *See Crabbs v. Scott*, 786 F.3d 426, 429 (6th Cir. 2015). But when a county officer acts on behalf of the state in issuing state marriage licenses, the county officer may be acting as an officer of the state, and thus may be shielded from suit by the state's sovereign immunity. *See Ermold v. Davis*, 936 F.3d 429, 434 (6th Cir. 2019). We will assume that Nabors should be treated as a state officer for immunity purposes and explain why, regardless, plaintiffs' suit may proceed.

*Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. His actions are ultra vires his authority and therefore may be made the object of specific relief."); *see also Dugan v. Rank*, 372 U.S. 609, 622 (1963).

True, the Supreme Court later clarified that immunity may shield a state officer's errors of judgment in the performance of his *discretionary* duties. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 n.11, 109–11. But everyone here—Nabors included—acknowledges that county clerks have *no* discretion to inspect officiants' credentials or to deny licenses on that basis; state law instead deems issuance of the licenses a ministerial duty. Nabors's alleged defiance of that sovereign directive is *ultra vires*. Because he cannot be said to act as "the state" when undertaking actions the state concededly forbids, he cannot shelter under its immunity.[6]

### V.

Recognizing the procedural complexity of this dispute, we will take a moment in closing to summarize today's decision. No plaintiff has standing to seek relief against Governor Lee, Attorney General Slatery, District Attorney General Helper, or County Clerks Crowell, Anderson, and Knowles. We thus **AFFIRM** the district court as to its dismissal of Governor Lee but **REVERSE** as to Attorney General Slatery, District Attorney General Helper, and County Clerks Crowell, Anderson, and Knowles. As a result, those portions of the district court's preliminary injunction that purport to bind Slatery, Helper, Crowell, Anderson, and Knowles are **VACATED**. By contrast, however, we **AFFIRM** the district court's determination that plaintiffs have standing to sue District Attorneys General Dunaway, Pinkston, and Jones, along with County Clerk Nabors. We also **AFFIRM** the district court's denial of these officials' sovereign immunity at the motion-to-dismiss stage, and so we do not disturb those portions of

---

[6]We stress that our decision today as to District Attorneys General Dunaway, Pinkston, and Jones, as well as to County Clerk Nabors, concerns only whether a live case or controversy exists at, and whether they are entitled to sovereign immunity at, the motion-to-dismiss stage. We take no position as to their potential reassertion of defenses such as sovereign immunity at successive stages of the litigation, when plaintiffs' allegations lose the presumption of truth and instead must be supported by evidence at summary judgment or proven at trial.

the preliminary injunction binding Dunaway, Pinkston, Jones, and Nabors.  Last, we **REMAND**

what remains of this suit to the district court for further proceedings consistent with this opinion.